**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  20-86** |
| | : | |
| **RICHARD BRYANT** | : | |

# MEMORANDUM WITH
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**KEARNEY, J.**                                                              **October 30, 2020**

  An officer with less than five years' experience patrolling streets near his police station around 8:30 p.m. on a slow January 11, 2018 evening pulls over a late model Chevrolet. The officer tells his less-experienced officer-partner the late model Chevrolet has a broken headlight. The partner does not see the broken headlight but confirms the car's proper registration. When the officer turns on the overhead police lights, the man promptly pulls over and initially complies in all respects with the more experienced officer's requests.  When the officer approaches, the thirty-five year old Black man driving the car appears nervous and speaks with a shaky voice as he turns over his documents to the officer without objection and, at one point, reaches across the console and passenger seat to open his glove compartment visible to the officers to retrieve additional documents. The man then gives his documents to the more experienced officer.

  Neither officer wore a body camera. The officer who claimed he saw a broken headlight then demands the man get out of the car. The man asks, "what's going on?" and refuses to leave his car claiming he knows his rights. We have no basis to find the officer told him why he pulled him over. The officer instead opens the car driver-side door and grabs the man's left arm to either hold him or pull him out of the car. The less-experienced officer then jumps into the

passenger seat and the two officers hold the man by his arms while the officers call and then wait for backup. When a backup officer arrives, the man agrees to get out of the car. The officers place him in handcuffs in the back of their patrol car. The more experienced officer then returns to the late model Chevrolet and searches the front center console. He finds a gun with ammunition. He then searches the car's backseat and finds a zipped backpack. He opens the zipped backpack and finds sealed baggies of a small amount of dry marijuana (approximately .78 ounces) and other narcotics. The less experienced officer swore to us he does not recall any aspect of the search. They drive the man to their police district a couple blocks away. Approximately an hour and a half later, the more experienced officer cites the man for a broken headlight. In interviews, the more experienced officer (less than five years) who claimed to see the broken headlight also now claims detecting a strong odor of marijuana coming from the car as he first walked up to it. The Commonwealth charges the man with possession of a gun, marijuana, and other narcotics found in the car search. The Philadelphia trial court dismisses drug charges after the preliminary hearing where the more experienced officer testified and the district attorney eventually dismisses the case. The United States decides to investigate and prosecute, and our grand jury returns an indictment earlier this year for illegally possessing a gun and narcotics over two years earlier.

The man now moves to suppress evidence of the gun, ammunition, and narcotics obtained during the search of his car. We held an extensive evidentiary hearing where we evaluated witness credibility. The two officers' stories differed as to material facts regarding the senior (almost five years' experience) officer's decision to search. The partner-officer swore he did not see a broken headlight and, although he was sitting in the front seat of car holding the man while they waited a backup officer, never smelled marijuana. He also did not participate in

the search. The officers did not testify they ever told the man why they pulled him out of the car. They cite only the Black man's nervousness, shaking hands, and one officer's belated reporting of a strong odor of marijuana on the street he claims comes from sealed bags of approximately .78 ounces of marijuana in the zipped backpack. The officers presented no evidence of danger presented by the man. After carefully evaluating the evidence and finding the arresting officer's testimony as to material facts leading to the car search lacks credibility and thus finding no reasonable, articulable suspicion nor probable cause to search the car and seize evidence, we grant the man's Motion to suppress all evidence of a firearm, ammunition, or narcotics obtained in this search.

## I.  Findings of Fact

After evaluating the credibility of witnesses and studying admitted exhibits, we enter findings based on facts adduced, and the lack of a credible alternative explanation consistent with the Constitution, during our extensive suppression hearing:

1.     Philadelphia Police Officer Mark Restuccia joined the Philadelphia Police Department in June 2013 after graduating from the Police Academy. In early 2018, he worked as a patrol officer in Philadelphia's 18th District close to the 500 block of 56th Street in the Cobbs Creek section of West Philadelphia.

2.     By January 2018, the Philadelphia Police Department had not issued body-worn cameras to the officers of the 18th District.

3.     We have no evidence as to whether the police considered this Cobbs Creek section of West Philadelphia a high crime area in early 2018.

4.     While driving his marked police car patrolling the Cobbs Creek area of West Philadelphia on a Friday night shift on January 11, 2018 around 8:30 p.m. in a marked police car,

Officer Restuccia saw a 2014 black Chevrolet Impala travelling southbound on 56th Street near the 500 block.

5.      Officer Restuccia drove the patrol car, while his partner, Officer Duy Nyugen, filled out paperwork in the passenger seat. We have no evidence of Officer Nyugen's police experience or training although he admitted he never testified in court before testifying in our suppression hearing.

6.      At the time Officer Restuccia saw the Chevrolet Impala, the officers had not made any stops in the first four hours of their shift.

7.       Officer Restuccia purportedly noticed the 2014 Chevrolet Impala had a broken headlight on the passenger side, but he could not recall either the location of his patrol car in relation to the Chevrolet Impala nor the direction in which he had been driving.

8.      Officer Restuccia did not see the driver of the Chevrolet Impala commit a traffic violation aside from allegedly driving with a broken headlight.

9.      Officer Nyugen swore he did not see the broken headlight but recalled seeing the headlight only after placing the driver in the back seat of his patrol car several minutes after the stop.

10.      Officer Restuccia told Officer Nyugen he wanted to stop the 2014 Chevrolet Impala for a broken headlight on the front of the car.

11.      We are not close to convinced as to whether the car had a broken headlight. The adduced evidence includes Officer Restuccia's testimony at the suppression hearing over two years later, his written reports and citation hours after he found contraband, and Mr. Bryant describing the incident on a recorded phone call while in custody three days later saying his headlights worked on the night in question. Based on Officer Restuccia's testimony and records,

the United States met its burden of showing a valid traffic stop by the slightest margin of preponderance of the evidence.

12.     Officer Restuccia eventually pulled up behind the 2014 Chevrolet Impala on South 56th Street. He turned on his patrol car's overhead lights and the spotlight so he could initiate a traffic stop for a vehicle inspection.

13.     The driver of the Chevrolet, thirty-five-year-old Richard Bryant, immediately pulled over to the side of 56th Street upon seeing the police lights.  Mr. Bryant was out at a store on this Friday evening.[1]

14.      Although winter dark outside at 8:30 p.m. on January 11, 2018, Officers Restuccia and Nyugen could see Mr. Bryant inside the car with the spotlight directed into the back window and the emergency lights and headlights but the seats slightly obstructed their view.

15.     Before approaching the car, the officers observed Mr. Bryant moving around inside the car, and reaching around in several different directions, including over the center console toward the passenger seat, and ducking his head down. There is no evidence the officers saw him open or reach into the center console.

16.     Officer Nyugen ran the license plate number through the patrol car's mobile data terminal to determine whether the car was "wanted." He asked Officer Restuccia to "keep an eye on" Mr. Bryant while he ran the search. The search did not turn up anything of concern about the car.

17.     Officer Restuccia then approached the car from the driver side "to conduct a vehicle investigation."[2] Officer Restuccia did not approach the car to simply issue a traffic citation, but to "conduct a vehicle investigation."  He swore before us, "we have the headlight

that initiates the vehicle investigation . . . I can't say what I was thinking at the time.  Normally, when I see an infraction, I go and inform the driver of that infraction and I make any other observations I can make at that time that I can proceed further."[3]

18.     Officer Nguyen approached the car from the passenger side.

19.     Although approaching the vehicle for a broken headlight, Officer Nyugen decided to stand "back a little bit" from the passenger side window. He explained he stepped back in case Mr. Bryant "pull[ed] out a gun," Officer Nyugen would be behind him over his right shoulder and Mr. Bryant would have to "twist his body" and "hit the headrest in order to get me."[4]

20.     We have no basis for the officers suspecting Mr. Bryant of having a gun or being dangerous. We have no basis to believe Officer Nyugen could have thought this vehicle inspection involved an armed and dangerous driver.

21.     To the contrary, the credible evidence confirms Mr. Bryant cooperated until he viewed the officers as overreaching while being nervous, as most may be when officers approach a car for no known reason.

22.     As the officers approached the car, Mr. Bryant stuck his head and upper torso outside of the driver's window and nervously asked with a shaky voice, "what's going on?"

23.     Rather than responding to Mr. Bryant's nervous question by informing him of the broken headlight and de-escalating his nerves, and contrary to his normal procedure as he swore before us, Officer Restuccia told Mr. Bryant to remain in the vehicle and did not tell him of a possible vehicle infraction.

24.     Upon arriving at the driver's side window, Officer Restuccia asked for Mr. Bryant's license, registration and insurance and asked Mr. Bryant to turn off the car.

25.     Mr. Bryant immediately turned off the car.

26.    He promptly turned over the paperwork he already retrieved in the car to Officer Restuccia.

27.    To retrieve the rest of his papers, Mr. Bryant, with shaking hands, then turned to his right, reached across the console, opened the glove compartment, got out the rest of the documents, and handed them to Officer Restuccia.

28.    Both officers readily saw each of Mr. Bryant's steps as they stood alongside the car with the benefit of their patrol car spotlight into the car.

29.    There is no evidence either officer saw anything suspicious in the glove compartment when Mr. Bryant opened it in front of them—one standing at each window with flashlights and the benefit of the spotlight through the back window of the car—and retrieved his paperwork.

30.    The parties did not adduce evidence of a problem with Mr. Bryant's license or registration/insurance documents.

31.    But then Officer Restuccia told Mr. Bryant to get out of the car.

32.    Officer Nguyen did not talk to Mr. Bryant.

33.    Up until this point, Mr. Bryant had complied with all of Officer Restuccia's requests.

34.    Mr. Bryant wanted to know why he needed to get out of his car.

35.    We heard no evidence either officer answered his question. They admit repeatedly demanding Mr. Bryant get out of the car.

36.    Mr. Bryant argued he "knew his rights" and would not get out of his car.

37.    Mr. Bryant told Officer Restuccia he did not consent to the officers searching his car and believed a search of his car would be illegal.

38.     Officer Restuccia then escalated the encounter by opening Mr. Bryant's driver side door.

39.     Officer Restuccia's and Officer Nyugen's accounts now begin to deviate. Officer Restuccia claims he opened the door because Mr. Bryant was "reaching around within the car." He claims Mr. Bryant "reached over the center console to the driver's side" and reached "in the glove compartment."[5] He claims he then grabbed Mr. Bryant's left wrist to stop him from reaching. Officer Nyugen, by contrast, does not say Mr. Bryant reached for anything. Rather, he claims, Officer Restuccia grabbed for Mr. Bryant's left wrist because Mr. Bryant refused to exit the vehicle. This inconsistency is among several inconsistencies leading to our finding much of Officer Restuccia's testimony during our suppression hearing lacked credibility on the material facts concerning grounds for a search.

40.     After Officer Restuccia grabbed Mr. Bryant's left wrist, Officer Nyugen opened the passenger side door, climbed inside the car, knelt or sat on the passenger seat, and grabbed Mr. Bryant's right arm. Officer Nyugen grabbed Mr. Bryant's arm because "his arm was flailing left and right, swinging all different directions, so we were afraid at that point he might have some type of weapon."[6]

41.     The United States offered no evidence allowing us to find a basis for the officers to believe Mr. Bryant had "some type of weapon." The evidence instead confirms, at most, Mr. Bryant erred in choosing to challenge two officers forcing him out of his car for no described reason.

42.     The officers and he indisputably disagreed as to the ability to remove Mr. Bryant from his car without describing a reason.

43.     While Officer Restuccia stood outside the car's driver door holding Mr. Bryant's left arm, Officer Nyugen knelt or sat on its passenger seat next to Mr. Bryant holding his right arm.

44.     Office Nyugen swore he did not notice a weapon or evidence of narcotics including the smell of marijuana in the car.

45.     While the officers held Mr. Bryant's arms, Officer Restuccia radioed for backup for a noncompliant driver.

46.     Officer Restuccia pulled Mr. Bryant's arm, but did not attempt to drag him out of the car.

47.     Soon after Officer Restuccia called for backup, he heard sirens and understood backup to be close by. Officer Nyugen held Mr. Bryant inside the passenger seat of car awaiting backup officers.

48.     When a backup officer arrived, Mr. Bryant exited the car.

49.     There is no evidence the officers forced him out of the car.

50.     The officers handcuffed him and secured him in the back of their patrol car.

51.     There is no evidence the officers told Mr. Bryant why they placed him in the back of their patrol car. The only credible evidence is Mr. Bryant argued about the officers' right to remove him from his car at 8:30 p.m. on a winter Friday evening as he returned from a store and they, along with backup officers, persuaded him to step out of his car after restraining him.

52.     The officers searched Mr. Bryant and recovered $620.00 in his jacket pocket.

53.     Officer Restuccia then returned to Mr. Bryant's car while Mr. Bryant sat handcuffed in the patrol car. There is no evidence Officer Restuccia voiced a concern about a weapon or smelling marijuana.

54.     Once back inside Mr. Bryant's car, Officer Restuccia opened the center console in the front seat and found a 9mm Ruger semi-automatic pistol loaded with 10 rounds of ammunition from the center console.

55.     Officer Restuccia also found a black and grey backpack with several zipped compartments sitting on the passenger backseat. Zipped inside one of the front packets, Officer Restuccia found a large sealed plastic storage bag, which contained smaller and sealed plastic bags.

56.     The  large sealed plastic storage bag contained: (1) twenty-two tinfoil wrapped packets containing suspected crack cocaine; (2) one clear zip-lock bag containing suspected crack cocaine; (3) five clear plastic bags containing suspected marijuana; and (4) one sandwich bag of marijuana. Subsequent testing revealed the marijuana weighed 22 grams (.78 ounces or .05 pounds).

57.     Officer Nyugen could not recall participating in this search.

58.     The officers transported Mr. Bryant to their nearby police district for processing.

59.     Back at their police district at around 10:00 p.m. (about an hour and a half after the initial traffic stop), Officer Restuccia wrote a summary traffic citation to Mr. Bryant for a broken headlight.

60.     Around the same time, now ninety minutes after the encounter, Officer Restuccia also created an internal Form 75-48 report for a violation of the Uniform Firearms Act and a Form 75-48A incident report for a vehicle/pedestrian stop.

61.     Detective David Tighe interviewed Officer Restuccia about the incident and prepared an "Investigation Interview Record." The detectives assigned to the case prepared two Philadelphia Police Department Arrest Reports.

62.     The 75-48A incident report asks the officer completing the form to "articulate fully the reason for stopping this vehicle." It also asks whether the officers "frisked" the vehicle, whether the officers "searched" the vehicle, and whether the officers "recovered" "evidence/contraband."[7] The form then provides room for the officers to describe the circumstances of a stop, vehicle frisk, search, or recovery of contraband subject to a character limit.

63.     Where the form asked "Vehicle Frisked?", Officer Restuccia answered, "No."  He left the field "Frisk Description" blank.[8]

64.     Where the form asked "Vehicle Searched?", Officer Restuccia answered, "Yes." In the "Search Description" field, he wrote, "Strong odor of marijuana emitting from inside of vehicle.[9] Driver seen moving aroun[d] inside vehicle a lot prior to police approach.[10] Driver's voice was shaking and nervous and driver's hand was shaking.[11] Overall mannerism was nervous. Search for narcotics, contraband, and weapons."[12]

65.     Officer Restuccia did not then mention Mr. Bryant's movements following his approach.[13]

66.     The form also asked whether the officers searched Mr. Bryant's person. Officer Restuccia noted the officers searched Mr. Bryant and offered the following description: "after being removed from vehicle driver was searched for weapons and narcotics because of strong smell of marijuana emitting from his vehicle."[14]

67.     This comment on the police form (over ninety minutes after the arrest) is the first time Officer Restuccia mentions a smell of marijuana in the car.

68.     The Interview Investigation Record reflects Detective Tighe asked Officer Restuccia what happened with Mr. Bryant. In describing the circumstances of the stop and the

search, Officer Restuccia told Detective Tighe, "He was taken out of the vehicle, searched and placed in the back of our patrol car. After we put the male in the vehicle we went back to the vehicle to check the vehicle for marijuana that I could smell."[15] Officer Restuccia does not mention being concerned Mr. Bryant could have a weapon or be dangerous.

69.    In the hours after the arrest, Officer Restuccia claimed he searched the car primarily because of a strong odor of marijuana.

70.    Officer Nyugen credibly swore to us he could not smell marijuana while he sat in Mr. Bryant's car directly in front of the backpack which the officers later discovered contained 22 grams or 0.78 ounces of marijuana in two closed baggies.

71.    Officer Nyugen, unlike Officer Restuccia, did not see a broken headlight and did not smell marijuana near the car let alone when he sat on the passenger seat holding Mr. Bryant's right arm awaiting backup officers.

72.    Three days after the stop, while Mr. Bryant remained in custody, he made a recorded telephone call. The United States did not identify the other speaker. Mr. Bryant told the person on the call his headlights in his late model Chevrolet car worked.

73.    In March 2018, the Commonwealth charged Mr. Bryant with: (1) prohibited possession of a firearm; (2) carrying a firearm without a license; (3) carrying a firearm in public; (4) intentional possession of a controlled substance; (5) possession of a controlled substance with intent to distribute; and (6) possession of a small amount of marijuana.

74.    Officer Restuccia testified at Mr. Bryant's March 2, 2018 preliminary hearing.

75.    The Philadelphia trial court dismissed the three drug charges for lack of evidence.

76.    A year and three months later, in June 2019, the Commonwealth *nolle prossed* the remaining three firearm offenses.

77.     In 2020, two years after Officers Restuccia and Nyugen stopped Mr. Bryant, the United States began investigating the officers' January 11, 2018 traffic stop of Mr. Bryant.

78.     Our grand jury indicted Mr. Bryant on February 20, 2020 for possession with intent to distribute a controlled substance; possession with intent to distribute a controlled substance within 1,000 feet of a school; possession of a firearm in furtherance of a drug trafficking crime; and, of being a felon in possession of a firearm.

79.     We held an evidentiary suppression hearing with witness testimony and several admitted exhibits.

80.     After carefully considering and comparing Officers Restuccia and Nyugen's testimony and evaluating both parties' adduced evidence, we find:

        a.   Officer Restuccia's testimony as to the smell of marijuana leading him to search the car lacks credibility; and,

        b.   Legally significant inconsistencies between the exhibits, Officer Nyugen's testimony, and Officer Restuccia's testimony regarding Mr. Bryant's behavior sitting in his car prevent us from finding reasonable suspicion of Mr. Bryant being armed and dangerous.

81.     With respect to the "strong odor of marijuana," while Officer Restuccia testified he smelled a "strong odor" of marijuana from his position outside the car when approaching the driver's side window, several facts call his observation and his credibility into serious question. Officer Restuccia found less than an ounce of unburnt marijuana sealed in three-protective layers. Officer Nyugen swore he could not smell the marijuana at any point, including when physically inside the car on the passenger seat.

82.     With respect to Mr. Bryant's behavior while sitting in the car, both officers testified Mr. Bryant moved around in his car before their approach. Given Mr. Bryant had

paperwork in his hand when the officers arrived at his driver side open window, his movements are consistent with gathering these papers. But then someone got angry. After Officer Restuccia ordered Mr. Bryant out of the car, the officers' accounts of what happened differ. Officer Restuccia testified Mr. Bryant began reaching for items in the glove box, prompting Officer Restuccia to grab his arm. Officer Nyugen testified Officer Restuccia grabbed Mr. Bryant before Mr. Bryant started moving because Mr. Bryant refused to exit the vehicle. Only after Officer Restuccia grabbed Mr. Bryant's left arm, Officer Nyugen testified, did Mr. Bryant begin "swinging" or "flailing" his right arm. While Officer Nyugen mentioned a concern Mr. Bryant might have a weapon, Officer Restuccia never testified to suspecting Mr. Bryant might be armed nor did he note suspicion in his incident reports aside from a vague description of searching the vehicle for "weapons, contraband and narcotics." The United States argues Mr. Bryant's "reaching" after providing his paperwork to the officers is sufficient on its own to furnish reasonable suspicion to search the car. As the officers' testimony does not align as to whether Mr. Bryant did actually "reach," we find this discrepancy legally significant. Given the credibility issues with Officer Restuccia's testimony regarding the smell of marijuana, we do not credit his uncorroborated testimony Mr. Bryant deliberately reached for items suggesting any type of danger, rather than merely resisting getting pulled out of his car.

## II.    Conclusions of Law

83.    Officers Restuccia and Nyuegen lawfully stopped Mr. Bryant.

84.    Officers Restuccia and Nguyen did not have probable cause to search the passenger compartment of the car under the automobile exception.

85.    Officers Restuccia and Nguyen did not have reasonable suspicion to search the passenger compartment of the car under *Terry v. Ohio*.[16]

### III.    Analysis

Mr. Bryant moves to suppress the items recovered from the car arguing the search violated the Fourth Amendment. The United States argues: (1) the officers validly stopped Mr. Bryant; (2) the officers had probable cause to search the vehicle under the automobile exception; and (3) the officers had reasonable suspicion to suspect Mr. Bryant was armed and dangerous, and permissibly searched the vehicle under *Terry* and its progeny. We consider each of these arguments in turn.

### A.    Officers Restuccia and Nyugen lawfully stopped Mr. Bryant.

Officer Restuccia and Officer Nyugen lawfully stopped Mr. Bryant under the Fourth Amendment because, based on a preponderance of the evidence, Officer Restuccia saw Mr. Bryant driving with an inoperable headlight. "[A] traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."[17] Officer Restuccia testified he observed Mr. Bryant driving with an inoperable headlight in violation of the Pennsylvania Motor Vehicle Code. At the suppression hearing, Mr. Bryant made several interesting points regarding the headlight. Officer Nyugen did not see the inoperable headlight before they pulled the car over, Officer Restuccia did not issue a traffic citation for the headlight until they were back at the station nearly two hours after the stop, and Mr. Bryant said on a recorded phone call three days after the incident his headlights worked. But as Mr. Bryant concedes, he has no evidentiary basis to dispute Officer Restuccia's testimony. This is a close call but, applying the preponderance of evidence standard, we find the stop valid under the Fourth Amendment.

**B.     The United States has not shown probable cause to search the car.**

The United States has not shown by credible evidence Officers Restuccia and Nguyen validly searched Mr. Bryant's car. We find Officer Restuccia's testimony, as repeatedly contradicted or not recalled by his partner, lacks credibility necessary for us to find probable cause.

The Supreme Court recognizes several exceptions to Fourth Amendment's prohibition against warrantless searches and seizures. "The automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'"[18] The United States has the burden of establishing the automobile exception by a preponderance of the evidence.[19] "The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'"[20] "If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search."[21]

The United States argues the purported odor of marijuana emanating from Mr. Bryant's car alone establishes probable cause and thus justifies the search under the automobile exception.[22] Mr. Bryant argues the smell of marijuana cannot give rise to probable cause because many Pennsylvanians can legally possess and consume marijuana under the Medical Marijuana Act of 2016.

While the parties present an interesting legal issue—whether and/or to what extent the Medical Marijuana Act impacts the probable cause analysis—we need not address the issue because we do not find the United States showed the officers could actually smell marijuana.[23] While Officer Restuccia later testified and later recounted in reports he could smell a "strong odor" of marijuana standing outside the car on the driver side, Officer Nyugen testified he could

16

not smell marijuana at any point during his interaction with Mr. Bryant, including when Officer Nyugen sat physically inside Mr. Bryant's car for several moments while waiting for the backup officer. This contradiction is especially troubling because Officer Nyugen knelt or sat on the passenger seat with the backpack containing the marijuana on the seat directly behind him. The officers later discovered a small amount of dry marijuana (approximately .78 ounces) enclosed in plastic sandwich bags. Those sandwich bags were sealed in a plastic storage bag, and the storage bag was zipped inside a backpack—encasing the marijuana in several layers of protective material. The total amount of marijuana recovered weighed less than one ounce. The marijuana had not yet been burned; no person had lit any of it before the stop.

Officer Nyugen's testimony he could not smell marijuana at all from inside the car, the triple-layer of protection surrounding the marijuana, the fact the marijuana had not been recently burned in the car, and the relatively small amount of marijuana uncovered casts too much doubt on Officer Restuccia's later testimony he could immediately smell a "strong odor" of marijuana emanating from the driver side window. We do not believe him after studying his testimony in light of all the evidence. We cannot find the smell supplied probable cause to search the car under the automobile exception.[24]

As the United States based their automobile exception argument entirely on the smell of marijuana, we cannot find the United States met their burden to establish the automobile exception to the warrantless search of the car.

###    C.    Officers Restuccia and Nyugen did not have reasonable suspicion based on articulable facts of Mr. Bryant being armed and dangerous.

The officers did not have reasonable suspicion to believe Mr. Bryant was armed sufficient to search the car under *Terry*.  In *Terry v. Ohio*, the Supreme Court held "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable

suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[25] An officer may frisk the subject of a *Terry* stop only if the officer has reasonable suspicion the person is "armed and dangerous."[26] Because of the danger associated with traffic stops, the Supreme Court in *Michigan v. Long* extended *Terry* to allow an officer to "search the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden . . . if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."[27] "In a sense, *Long* authorized a 'frisk' of an automobile for weapons."[28] "Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."[29] To determine whether the officers had reasonable suspicion to believe Mr. Bryant was armed and dangerous, we use a "totality of the circumstances" test.[30] We "allow[] officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." [31]

The United States argues Officer Restuccia permissibly searched Mr. Bryant's vehicle under *Terry* and *Long* because the officers had reasonable suspicion Mr. Bryant was armed and dangerous. We find the United States's characterization of the search of Mr. Bryant's car as a vehicle frisk dubious. In Officer Restuccia's many accounts of what happened on the night of January 11, 2018—including his testimony at the suppression hearing, his testimony at the state preliminary hearing, his interview with Detective Tighe, and his incident reports—he never once mentioned he believed Mr. Bryant was armed or dangerous. On the incident report he filled out

hours after the incident, Officer Restuccia specifically answered, "No" in response to the question: "Vehicle Frisked?" and left the field asking for a description of the vehicle frisk blank.

Every time he has been asked to give an account as to why he searched Mr. Bryant's vehicle, Officer Restuccia consistently cites the odor of marijuana; he does not cite suspicion Mr. Bryant might be armed or dangerous. For example, in the incident report, Officer Restuccia cited the primary reason for the vehicle search as the "strong odor of marijuana." Where the same form asked for a description of the search of Mr. Bryant's person, Officer Restuccia wrote, "after being removed from vehicle driver was searched for weapons and narcotics *because of strong smell of marijuana emitting from his vehicle*."[32] During his interview with Detective Tighe, Officer Restuccia explained he went back and searched Mr. Bryant's vehicle after he secured Mr. Bryant in the patrol car "to check the vehicle for the marijuana I could smell."[33] He did not say he went back to frisk the car because he believed Mr. Bryant might have access to weapons. Officer Restuccia's primary impetus for searching the vehicle was the alleged smell of marijuana, not an articulable suspicion Mr. Bryant concealed weapons in his car.[34]

Officer Nyugen, by contrast, swore he suspected Mr. Bryant might have a weapon. But we cannot find a reason why. Officer Nyugen's testimony raises some concerns. Unlike Officer Restuccia, Officer Nyugen had not earlier testified about this two-year-old traffic stop and the United States did not offer evidence Officer Nyugen created reports or took notes about what happened on January 11, 2018. Officer Nyugen's testimony also suggested he feared Mr. Bryant might be armed and dangerous well before he walked up to the car. Officer Nyugen testified he kept telling Officer Restuccia to "keep an eye" on Mr. Bryant as Officer Nyugen ran his plates. At this point, Officer Nyugen knew very little about Mr. Bryant.  He knew Mr. Bryant was driving a not-stolen Chevrolet Impala, possibly with one inoperable headlight (though Officer

Nyugen had not seen the headlight himself), and he knew the man moved around in the car before the officers approached in a manner consistent with a person retrieving his paperwork for the traffic stop.  Officer Nyugen's perception of Mr. Bryant may not have been objectively reasonable from the start. Further, Officer Restuccia, not Officer Nyugen, searched Mr. Bryant's vehicle.

Despite our suspicion the officers rebranded the search of Mr. Bryant's car as a vehicle "frisk" two years after the fact to ease their burden of proof, we will nevertheless consider whether the officers had reasonable suspicion Mr. Bryant was armed and dangerous. The United States now offers four reasons why Officers Restuccia and Nyugen had reasonable suspicion to *Terry* frisk Mr. Bryant's car: (1) Mr. Bryant "continued to reach for items in his vehicle after he had produced his license and registration"; (2) Mr. Bryant appeared nervous; (3) "a strong odor of marijuana was coming from inside the vehicle"; and (4) Mr. Bryant "repeatedly refused the officers' commands to exit the vehicle."[35] As discussed above, we do not find the testimony regarding the strong odor of marijuana credible; thus, we consider only Mr. Bryant's arm movements, his nervousness, and his refusal to exit the vehicle in our analysis.[36]

Our Court of Appeals has held, on a few occasions, refusing to obey orders and making suspicious hand motions may give rise to reasonable suspicion a suspect is armed and dangerous. In *Moorefield*, Pittsburgh officers on routine patrol observed a car driving recklessly.[37] The officers pulled the car over, approached, and saw a driver and a passenger inside.[38] The passenger immediately attempted to exit the car.[39] The officers ordered the passenger back into the car.[40] Soon after, the officers then ordered the driver and the passenger out of the car.[41] The driver followed the officers' instructions, but the passenger did not.[42] The officer saw the passenger lean back and shove something down toward his waist.[43] He then pushed his upper

body out of the window, which prompted the officers to tell him to stay in the car with his hands in view.[44] The passenger then raised and lowered his hands several times before finally keeping his hands up. [45] The officers testified they believed he may have been trying to conceal weapons or narcotics based on his suspicious hand movements.[46] The officers frisked the passenger and discovered a gun in his waistband.[47] Our Court of Appeals held the passenger's "furtive hand movements and refusal to obey the officers' orders constituted suspicious behavior" and warranted the pat-down.[48] Our Court of Appeals credited the officers' testimony the driver's "behavior was consistent with the behavior of a person trying to conceal something," which a reasonably prudent man could have believed to be a weapon.[49]

In *Colen*, police officers pulled over a vehicle with excessively tinted windows in violation of the traffic code.[50] As the officers approached the car, they saw the driver quickly shut the center console.[51] The officers asked the driver for his license and registration, which the driver provided, and the officers returned to their car.[52] While in the patrol car, the officers saw the driver reach again for the center console.[53] The officers then removed him from the car, frisked him, and searched the portion of the car in the driver's control.[54] During this search, the officers found a loaded handgun.[55] Reviewing the driver's motion to suppress, our Court of Appeals determined the officers had reasonable suspicion the driver was armed and dangerous.[56] The court noted the driver continued to reach for the center console after he had already handed the officers his license and registration, negating the possibility of reaching for those items.[57] Our Court of Appeals held "the officer's decision to check the center console for weapons was completely justified by the circumstances."[58]

In *Mitchell*, Wilmington police officers responding to a report of gunshots near an intersection late at night encountered a vehicle driving very slowly with its headlights turned

off.[59] When the officers passed the car, they informed the driver her lights were off, but the driver disagreed.[60] They then noticed someone "crouched" in the car's backseat. After the cars passed each other, the driver turned on the headlights and the officers made a U-turn and began a traffic stop.[61] When the officers approached the car, they noticed the backseat passenger had his arms crossed over his midsection and was avoiding eye contact with the officers.[62] The officers requested identification from the occupants, and they both obliged.[63] The officers ran a search for the passenger and learned he had a criminal record, including weapons offenses.[64] The officers ordered the driver and the passenger from the vehicle, but the passenger refused.[65] The officers drew their service weapons and again ordered him to exit the vehicle several times.[66] An officer then pulled the passenger out of the car and onto the ground. After the officers threatened to tase him, he stopped resisting the officers' attempts to handcuff him.[67] The officers patted him down and found a firearm tucked in his waistband.[68]

The passenger moved to suppress the firearm, arguing the officers lacked an articulable suspicion to conduct a frisk under *Terry.*[69] Our Court of Appeals determined the officers had reasonable suspicion to conduct a *Terry* frisk under the totality of the circumstances.[70] Our Court of Appeals explained the defendant was "crouching in the back seat of a vehicle, which was traveling at an unusually low speed in the dark of night with its headlights off."[71] He also "appeared to be concealing something and he refused to comply with the officers' orders to leave the vehicle."[72] Officers knew of his criminal history involving weapons and throughout the stop the officers knew gunshots had recently been fired in the vicinity.[73]

Notwithstanding this case law, judges in this District are prudently careful not to give too much weight to a "suspicious hand motion" in weighing the totality of the circumstances when questions regarding the credibility of an officer's testimony exist. In *United States v. Harrison*,

Philadelphia police officers patrolling the area near South Simpson Street noticed a man crouch behind a car when they passed.[74] The officers circled the block and returned to the car.[75] They approached the car on both sides and found the crouching man in the passenger seat.[76] The officers recognized the passenger as someone they knew from their regular patrol of the neighborhood, but they did not recognize the driver.[77] The occupants rolled down their windows, and the officers testified they smelled a strong odor of marijuana emanating from the driver's side window.[78] The officers testified the driver was nervous, but the passenger was not.[79] One officer testified the driver was moving his left hand toward his thigh and the driver's side door while the officers were talking to him.[80] The other officer did not see this hand movement.[81] The driver offered the officers his license and registration, and in response, the officers ordered him to turn off his vehicle.[82] The driver asked if something was wrong. Rather than answer his question, the officer ordered him in a louder voice to turn off the vehicle.[83] Initially, the driver "hesitated to comply and reached to close the passenger window and lock the doors . . . [b]ut on second thought, [he] complied with the request."[84] Then, an officer opened the door and began to pull him out of the car.[85] Once the officer pulled him out of the car, the officer patted him down and discovered drugs.[86] The officer then noticed the driver looking back at the vehicle.[87] The officer secured the driver in handcuffs in the patrol car down the street and went back and searched the car, finding a gun in the front seat of the car and marijuana in both the center console and the trunk of the car.[88]

The driver moved to suppress the evidence arguing no reasonable suspicion.  Judge Schiller granted the motion to suppress. As an initial matter, Judge Schiller did not find the officers' testimony regarding the smell of marijuana credible.[89]  He also assessed whether the officers had a basis to search the vehicle based on the driver's "furtive movements and

nervousness."[90] He noted the officers' inconsistent testimony regarding "significant facts," and he believed one officer "exaggerated the suspiciousness of" the driver's arm motion toward the driver's side window in part because other officer did not see it.[91] Judge Schiller explained "[w]hile [the driver] may very well have moved his arm, [the officer] appears to have embellished the suspiciousness of [the driver's] movement to strengthen his decision to signal [the other officer] to remove [the driver] from the car."[92] Judge Schiller further noted the driver did not make a "specific movement," such as "movement at the floor area of the car or a stuffing motion," which would be more likely to give rise to reasonable suspicion.[93]

Judges in our District have also declined to find reasonable suspicion despite a driver's refusal to cooperate with police orders. In *United States v. Austin*, Philadelphia police officers pulled over a car after witnessing the driver ignore a red light.[94] As the officers approached the car, the driver attempted to get out.[95] The officers ordered the driver back into the car, and the driver complied.[96] After the driver gave the officers his license and registration, the driver again attempted to exit the vehicle while reaching down under the driver's seat with his right hand.[97] Concerned for his safety, the officer grabbed the driver's arm, but then observed the driver had reached for his cellphone.[98] Another officer grabbed the driver, pulled him out of the car, handcuffed him, and put him in the back of a police car.[99] Although nervous, the driver did not resist as officers frisked him.[100] After placing the driver in the car, the officers searched the interior of the car and found a gun in the center console.[101]

The driver moved to suppress the gun. Judge Katz granted the motion. Judge Katz first noted any reasonable suspicion the driver was armed and dangerous disappeared when the officer realized the driver had reached toward a cellphone, not a weapon.[102] The United States argued the officers had reasonable suspicion to search the vehicle even after the one officer saw

the cellphone because "the defendant's nervous behavior and the defendant's efforts to reach beneath his seat for a cell phone created reasonable suspicion."[103]  Judge Katz disagreed.  He noted, "it is not uncommon for people to exhibit signs of nervousness in front of a police officer."[104]  With regard to the driver's attempt to exit the vehicle, Judge Katz quoted the Supreme Court, "a refusal to cooperate, without more, does not furnish the minimum level of justification needed for a detention or a seizure."[105]

The Supreme Court's teachings in *Terry* do not justify a frisk of Mr. Bryant's car. Although Mr. Bryant may have been nervous with a shaky voice, we find this understandable behavior to have little probative value as to whether he was armed and dangerous.  We with Judge Katz's observation *Austin*—people often exhibit signs of nervousness in front of police officers. We do not find it unusual for Mr. Bryant to be nervous when confronted by officers, particularly when the officers refused to tell him the reason for the stop. [106]

We next consider whether Mr. Bryant's "movements" created reasonable suspicion. Mr. Bryant's counsel persuasively argued at the suppression hearing his movements before the officer's approach were consistent with retrieving his paperwork, some of which he had in hand by the time the officers approached his car.

Mr. Bryant's movements after the officers approached are a closer call. Officer Restuccia testified he saw Mr. Bryant "reaching" and attempting to retrieve items from the glove box before he grabbed Mr. Bryant's arm. Officer Restuccia did not testify he believed Mr. Bryant to be trying to access a weapon. Officer Restuccia testified Mr. Bryant reached toward items in the glove box, which he had already opened in front of the officers to retrieve his license and registration. Officer Restuccia did not testify Mr. Bryant made any moves toward the back seat, the center console, or any area out of the officers' view. Neither officer reported seeing anything

suspicious in the glove box. Nor did either officer testify they believed Mr. Bryant may have concealed something in the glove box.

Officer Nyugen, by contrast, did not testify any "reaching" occurred before or after Officer Restuccia grabbed hold of Mr. Bryant. Officer Nyugen testified Officer Restuccia grabbed Mr. Bryant's arm because he would not exit the vehicle, and after Officer Restuccia grabbed Mr. Bryant's left arm, Mr. Bryant began "flailing" his right arm.

As in *Harrison*, the inconsistencies between the officers' testimony cast doubt on the suspiciousness of Mr. Bryant's movements. While "reaching" could be interpreted as the type of "deliberate" movement distinguished in *Harrison*, "flailing" seems more consistent with a person becoming agitated at being pulled from his vehicle during a routine traffic stop (especially when he does not know why the officers stopped him) and trying to break free. In any event, Officer Restuccia describes Mr. Bryant "reaching" to the glove box, which the officers had in clear view. This is different from the situation in *Colen* where the driver reached for the center console, which the driver did not open in front of them, while the officers were back in their patrol car. The officers in *Colen* had no way of knowing what might be hidden in the center console. Like *Austin*, where the driver's reach toward the door did not create reasonable suspicion to search the center console once the officers could see inside the door, Mr. Bryant's reach toward items in the glove box in the officers' view did not create reasonable suspicion to believe he had a gun in the center console.

We also consider Mr. Bryant's refusal to exit the vehicle. Mr. Bryant pulled over the car immediately when the officers signaled. He gathered some of his paperwork in advance of their arrival at the car and quickly retrieved the rest when they arrived. He turned off the car when asked to do so. Mr. Bryant asked why the police pulled him over. The police did not respond.

Mr. Bryant did not become non-compliant or agitated until the officers ordered him out of his carl with no explanation as to why he had been stopped, after he had already provided his license, insurance, and registration. Under these circumstances, we do not think Mr. Bryant's refusal to cooperate creates reasonable suspicion. Unlike *Moorefield*, where the defendant disobeyed every police command from the moment of the stop and made a serious of erratic movements, Mr. Bryant complied with all of the officers' requests up until they ordered him out of the car with no explanation. Unlike *Mitchell*—where the officers knew the defendant had a record of firearm offenses, the officers were responding to a call regarding gunshots, and the defendant appeared to be concealing something at his midsection—Officers Nyugen and Restuccia had no independent reasons to suspect Mr. Bryant was dangerous when he refused to exit the vehicle. We agree with Judge Katz's assessment in *Austin*, "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed" for the *Terry* frisk of the vehicle.

## IV.  Conclusion

We carefully evaluated the credibility of the testifying arresting officers. We evaluated each admitted exhibit. The officers, lacking body cameras which could assist all of us in understanding what they saw and heard, presented different facts as to the material information warranting the stop, search, and seizure all by one officer with less than five years' experience. We find their testimony lacks credibility in several material respects regarding their reasons to search Mr. Bryant's car on January 11, 2018. We cannot find reasonable and articulated reasons for a *Terry* frisk of the car. We cannot find probable cause based on one officer's later recounting a strong odor of marijuana in the car when his officer-partner did not smell the marijuana even though he sat in the car directly in front of the zipped backpack contained sealed plastic baggies

of less than one ounce of dry marijuana. Absent a credible basis to support the search, we grant

Mr. Bryant's motion to suppress.

---

[1] Gov't Ex. 7; N.T. 93: 8-14.

[2]  N.T. 43: 11-43:2.

[3] *Id.*

[4] N.T. 74:24-75:5.

[5] N.T. 13: 5-18.

[6] *Id..* 64:18-22.

[7] Gov't Ex. 3.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Gov't Ex. 4.

[16] *Terry v. Ohio*, 392 U.S. 1 (1968).

[17] *United States v. Moorefield,* 111 F.3d 10, 12 (3d Cir.1997).

[18] *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (quoting *United States v. Salmon,* 944 F.2d 1106, 1123 (3d Cir.1991), *abrogated on other grounds by United States v. Caraballo–Rodriguez,* 726 F.3d 418 (3d Cir.2013) (en banc)).

[19] *Id.* (internal citations omitted).

[20] *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 230-31 (1983)).

[21] *Id.* (quoting *Gates*, 462 U.S. at 238).

[22] ECF Doc. No. 32 at 5.

[23] We also do not need to address the United States' arguments regarding Officer Restuccia's good faith understanding of the interplay between a search and Pennsylvania's Medical Marijuana Act.

[24] *See, e.g. United States v. Harrison*, No.17-228, 2018 WL 4405892, at *7 (E.D.Pa. Sept. 17, 2018) (finding testimony regarding odor of marijuana not credible where officers' testimony had been called into question in the state court, the marijuana weighed less than 30 grams, the marijuana was unburnt, and the marijuana was sealed in containers and stored throughout the car).

[25] *United States v. Sokolow,* 490 U.S. 1, 7 (quoting *Terry,* 392 U.S. at 30).

[26] *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

[27] *Michigan v. Long,* 463 U.S. 1032 (1983) (quoting *Terry,* 392 U.S. at 21).

[28] *United States v. Colen*, 482 F. App'x 710, 711–12 (3d Cir. 2012)

[29] *Id.*

[30] *United States  v. Nelson*, 284 F. 3d 472, 478 (3d. Cir 2002).

[31] *United States v. Slone*, No. 16-400, 2017 WL 1042074, at *2 (E.D. Pa. Mar. 17, 2017) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[32] Gov't Ex. 3.

[33] Gov't Ex. 4.

[34] While Officer Restuccia swore to us he searched the car for "weapons, contraband, and narcotics," we do not find this to conclusively establish Officer Restuccia believed Mr. Bryant to be armed and dangerous. There is no evidence or indicia of suspicion Mr. Bryant had generic "contraband" aside from weapons or narcotics, so we do not interpret this description to have probative value as to what Officer Restuccia believed to be the basis of his search.

[35] ECF Doc. No. 32 at 4.

[36] Both parties cite cases from outside this jurisdiction in support of their arguments as to whether these facts created reasonable suspicion. While we carefully read and considered each of these cases, including the cases in the string cite in *United States v. Patton,* 705 F.3d 734, 739 (7th Cir. 2013) identified in the United States's sur-reply, we choose to rely on the ample case law available in our Circuit which is also more directly on point with our findings.  The cited cases from other jurisdictions are also readily distinguishable from Mr. Bryant's conduct.

---

[37] *Moorefield*, 111 F.3d at 11.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 12.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at 14.

[49] *Id.*

[50] 482 F. App'x at 713.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *United States v. Mitchell*, 454 F. App'x 39, 40 (3d Cir. 2011).

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.* at 41.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *United States v. Harrison*, No. 17-228, 2018 WL 4405892, at *1 (E.D. Pa. Sept. 17, 2018).

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.* at *2.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

---

[87] *Id.*

[88] *Id.* at * 2-3.

[89] *Id.* at * 6.

[90] *Id.* at * 9.

[91] *Id.* at * 8-9.

[92] *Id.* at * 7.

[93] *Id.* at * 9.

[94] *United States v. Austin*, 269 F. Supp. 2d 629, 630 (E.D.Pa. 2003).

[95] *Id.*

[96] *Id.*

[97] *Id.* at 631.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.* at 634.

[103] *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

[104] *Id.*

[105] *Id.*

[106] Mr. Bryant's counsel takes it one step further: she argues Mr. Bryant's nervousness is not only understandable but should be expected from a Black man driving a late model car pulled over by a white younger officer for no described reason. Knowing the risks, Mr. Bryant immediately turned over his paperwork and cooperated until he viewed Officer Restuccia's repeated demands to exit his car as violating his understanding of his constitutional rights. Counsel further argues even if we have no evidence of the officer's overt bias towards Mr. Bryant, the officer's conduct exhibits implicit bias tainting the stop. The United States elected not to respond to this argument other than arguing nervousness because Mr. Bryant concealed a weapon and narcotics. Given our specific findings as to the officers' lack of credibility in their

testimony before us, we need not address whether their bias or implicit bias would otherwise so taint the stop as to render the search unconstitutional.